**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KYREEK BLAKENEY,** <br> **Plaintiff** | : <br> : | **No. 3:25-CV-2062** |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | FILED SCRANTON |
| **LAUREL HARRY, *et al.*,** <br> **Defendants** | : <br> : | AUG 2 5 2026 |

PER [signature] DEPUTY CLERK

**MEMORANDUM**

Plaintiff Kyreek Blakeney initiated the above-captioned *pro se* action under 42 U.S.C. § 1983,[1] alleging constitutional violations by prison officials at SCI Camp Hill. The court screened Blakeney's initial complaint and dismissed most of the claims pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted. The court gave Blakeney the option of filing an amended complaint or proceeding on the plausibly stated First Amendment claims. Blakeney opted to file an amended complaint, which is presently before the court for screening under Section 1915A(a).

## I. BACKGROUND

Blakeney lodged the instant Section 1983 action in this court in October 2025. (See generally Doc. 1). His initial, sprawling complaint was a model of

[1] Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002).

"kitchen sink" or "shotgun" style pleading, where he attempted to raise every conceivable claim regarding every conceivable wrong against thirty-nine different defendants. (See Doc. 20 at 2). The court noted, however, that such pleading is confusing, unfair to opposing parties, a waste of judicial resources, and likely a violation of Federal Rule of Civil Procedure 11, and thus it is impermissible. (See id. (citing Pelphrey-Weigard v. Res. for Human Dev., Inc., 818 F. Supp. 3d 685, 693-95 (E.D. Pa. 2026) (collecting cases); Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 97 (3d Cir. 1988) (acknowledging that "the practice of 'throwing in the kitchen sink' at times may be so abusive as to merit Rule 11 condemnation"); McClain v. Carney, No. 2:23-cv-4012, 2024 WL 113761, at *5 (E.D. Pa. Jan. 10, 2024) (noting that district courts "have frowned on prisoners' attempts to lump together their multifarious grievances about life in a single prison[.]")).

Nevertheless, because Blakeney is a *pro se* inmate, the court elected to screen his kitchen-sink pleading rather than dismiss it outright. (See id.). Upon exhaustive review, the court concluded that Blakeney appeared to be attempting to raise multiple unrelated Section 1983 claims, including First Amendment retaliation, Eighth Amendment failure to protect, Eighth Amendment conditions of confinement, Fourteenth Amendment deprivation of property without due process of law, Fourteenth Amendment procedural due process, and civil conspiracy. (See id. at 8). It further appeared that Blakeney was attempting to assert state-

law tort claims of assault and defamation, as well as violations of various Pennsylvania statutes, although it was impossible to discern the contours of those claims or whom they targeted. (See id. (citing Doc. 1 at p. 3)).

Following individualized review of each Section 1983 claim alleged, the court concluded that Blakeney had plausibly asserted a single, individual capacity First Amendment retaliation claim against defendant C.O. Zimmerman, as well as a plausible official capacity First Amendment retaliation claim against defendant Secretary Laurel Harry for prospective injunctive relief. (See generally id. at 9-29). The court gave Blakeney the option of filing an amended complaint and provided specific and detailed instructions regarding amendment. (See id. at 26-28). If Blakeney opted not to file an amended pleading, the court explained, his First Amendment claims against C.O. Zimmerman and Secretary Harry would move forward. (See id. at 29).

Blakeney chose to file an amended complaint. (See generally Doc. 25). In his amended pleading, he sues seventeen defendants: Secretary of Corrections Laurel Harry, SCI Camp Hill Superintendent Kendall, Lieutenant Elwell, Sergeant Kansas, C.O. Zimmerman, C.O. Russler, C.O. Myers, C.O. Tidwell, Nurse Jane Doe, Nurse Alisha, Lieutenant Benyo, Deputy Superintendent Albert, Major Bly, D.S.C.S. Jennifer McClelland, C.C.P.M. Lacosta Mussoline, Unit Manager Smith Dodson, and Unit Manager Ross Miller. (See id. ¶¶ 5-21). He appears to have

narrowed his claims to Eighth Amendment failure to protect. (See id. ¶¶ 110-15). It is possible that he is also attempting to assert a First Amendment retaliation claim, although he does not specifically include a retaliation count. (See id. ¶¶ 33, 85, 104).

In his amended complaint, Blakeney asserts that at all times relevant, he was incarcerated on "E Block" in the Restricted Housing Unit (RHU) of SCI Camp Hill. (Id. ¶¶ 23-25). He alleges that on or around March 2, 2025, he witnessed correctional officers bring inmate Devin Craddock to the unit and place him in cell "EB 5." (Id. ¶ 25). Some time later, Craddock yelled out to correctional officers, asking them to make sure he was listed to participate in Ramadan. (Id. ¶ 26). Blakeney called over to Craddock and attempted to assist him in determining whether he was on the list to participate in the Ramadan fast. (Id. ¶ 27). Craddock then told Blakeney to "suck his d*ck" and to "mind [his] f*cking business." (Id.) Blakeney responded, "If these doors wasn't [sic] here between us, I'll put my hands on [you]." (Id. ¶ 28). Craddock retorted that they can "celly up" and Blakeney can "make it happen." (Id. ¶ 29).

Blakeney alleges that during the security rounds (presumably later that day), C.O. Zimmerman, C.O. Russler, and C.O. Myers told him that they "have their money on" Craddock, meaning that Craddock "will beat [Blakeney] up" if the two were to fight. (Id. ¶ 31). On the morning of March 4, 2025, Lieutenant Elwell

approached Blakeney's cell ("EB 4") and told Blakeney that he was the only officer who had his "money on" Blakeney. (Id. ¶¶ 25, 32-33). He further told Blakeney that he believed Blakeney can "take" Craddock and that he "hate[s] faggots." (Id. ¶ 33). Blakeney avers that Lt. Elwell then stated, "I thought we had a[n] understanding that you wasn't [sic] going to file anymore paperwork." (Id.) Lt. Elwell purportedly continued, "[Y]ou['re] going to sign off on your Grievances or we are going to make sure you experience something that you never experience[d] before." (Id.)

Blakeney asserts that approximately an hour later, C.O. Zimmerman, C.O. Myers, C.O. Russler, and Lt. Elwell approached his cell for lunch service, and Lt. Elwell personally handed a lunch tray to Blakeney while stating, "personal special tray." (Id. ¶ 34). Blakeney recounts that he immediately threw away all the food he "couldn't see through," leaving only a hamburger to eat. (Id. ¶ 35). According to Blakeney, this hamburger was intentionally contaminated with "O.C." or pepper spray, causing him to have a "fire sensation through his entire body" and difficulty breathing for several minutes. (Id. ¶¶ 36-39).

Blakeney avers that he reported this food-contamination incident to Nurse Alisha and then to all the correctional officers on second shift. (Id. ¶¶ 41-44). Later that evening, the second shift officers moved Blakeney to a "POC/camera cell" on E-A pod. (Id. ¶ 47). Blakeney does not specify how long he remained in

the "POC/camera cell," but it appears that he was moved back to E-Block three or four days later (*i.e.*, on March 7 or March 8). (Id. ¶ 51). When he was moved back, however, he was taken to cell EB 5. (Id. ¶ 49). Blakeney asserts that when he realized what was happening, he immediately told the corrections officer who was transferring him that he did not want to move into cell EB 5 with inmate Craddock. (Id. ¶ 50). The officer allegedly responded that if Blakeney did not move into that cell, "the officers will continue to treat [him] the way they have been treating [him] and it will get wors[e]." (Id.)

Blakeney contends that, on the first day he and Craddock were celled together, both inmates notified the second-shift officers that they did not want to be cellmates and that they had "problems." (Id. ¶ 52). According to Blakeney, the second-shift officers responded that the "first shift" officers were responsible for moving inmates. (Id.)

Two or three days later, Craddock was taken to the medical department. (Id. ¶ 53). Blakeney claims that while Craddock was gone, he attempted to get a different cellmate to prevent Craddock from moving back into the cell. (Id.) He avers that he saw "PRC" and was switched to administrative custody (AC) status. (Id.) He alleges that he then told D.S.C.S. McClelland, Major Bly, Unit Manager Miller, Deputy Superintendent Albert, Unit Manager Smith Dodson, and C.C.P.M. Mussoline that the RHU officers purposely housed him with inmate Craddock

despite knowing that "[there is] tension between us" and that Blakeney did not "feel comfortable being housed with this inmate." (Id.) Blakeney recounts that he further told them that because he was now in AC status, he and Craddock "were not suppose[d] to be cellmates." (Id.)

On March 17, 2025, first-shift officers moved Craddock back into Blakeney's cell. (Id. ¶ 55). Around 2:05 p.m. that day, Blakeney notified Sgt. Kansas during his rounds that he is AC status and that Craddock is "disciplinary custody" status, so the two were not supposed to be housed together under "DOC policy 802 Administrative Custody." (Id. ¶ 56). Blakeney additionally informed Sgt. Kansas that there was tension between the inmates and there were three unoccupied cells on the block. (Id.) Sgt. Kansas responded that he would "look into it." (Id. ¶ 57). Blakeney claims that Craddock spoke with C.O. Tidwell several hours later, explained the recent conversation between Blakeney and Sgt. Kansas, and asked if he was going to be moved to a different cell. (Id. ¶ 58). C.O. Tidwell allegedly replied that he would look into it and speak with the sergeant as well. (Id.)

Approximately 12 hours later, at 4:30 a.m. on March 18, 2025, Blakeney alleges that Craddock physically and sexually assaulted him. (Id. ¶ 61). Blakeney claims that Craddock attacked him from behind, choked him unconscious, bound him with sheets, and raped him. (Id. ¶¶ 61-62). According

to Blakeney, Craddock told him that he was the "7th or the 11th person" that Craddock had raped. (Id. ¶ 63). Craddock then allegedly "broadcast to the whole pod" that he had raped Blakeney, stating that "the Guards wanted him to do that and they got what they wanted." (Id.)

Blakeney was eventually untied by correctional officers and taken to the medical department. (Id. ¶¶ 65-67). He was then transported to an outside hospital, where he was evaluated and a rape kit was collected. (Id. ¶ 70). When he returned to SCI Camp Hill, he was first placed in the medical department and then in a "camera cell" in the RHU. (Id. ¶¶ 74, 79).

According to Blakeney, the correctional officers' abuse did not end after he was sexually assaulted by Craddock. Blakeney recounts that on April 30, 2025, he was told several times by unspecified officers that he had a visitor, but Blakeney did not believe the officers and refused the purported visits. (Id. ¶ 86). C.O. Russler then ordered Blakeney to get dressed and told him he had a mandatory visit to attend. (Id.)

During his escort to this alleged "visit," Blakeney claims that he was told that it was a "surprise" visit and that the correctional officers "are not the only people [who] hate[] him." (Id. ¶ 87). When Blakeney arrived at the video visiting room, C.O. Russler stuck his head into the room and announced that Blakeney was present. (Id. ¶ 88).

Blakeney alleges that he was then subjected to watching a graphic, extremely disturbing video of a man raping and repeatedly beating a woman. (Id. ¶¶ 89-97). Apparently, Blakeney knew the identities of the man and the woman in the video. (Id. ¶ 89). Blakeney describes the sexual and physical assaults in painstaking detail, none of which needs to be repeated here. Suffice it to say that the alleged contents of the footage are horrific and deeply unsettling. Blakeney alleges that after the incident, he filed a grievance that was rejected but forwarded to the security and PREA offices. (Id. ¶ 98). He does not state the outcome of any security or PREA investigation.

Blakeney expressly pleads that he is raising an Eighth Amendment failure-to-protect claim against most Defendants. (See id. ¶¶ 99-115). Yet it is clear from his amended complaint that he is also asserting claims of First Amendment retaliation and state-law intentional infliction of emotional distress. Blakeney's amended complaint is presently before the court for Section 1915A(a) screening.

## II. STANDARD OF REVIEW

Courts are statutorily obligated to review, "as soon as practicable," unrepresented prisoner complaints targeting governmental entities, officers, or employees. See 28 U.S.C. § 1915A(a). One basis for dismissal at the screening stage is if the complaint "fails to state a claim upon which relief may be granted[.]" Id. § 1915A(b)(1). This language closely tracks Federal Rule of Civil

Procedure 12(b)(6). Accordingly, courts apply the same standard to screening a *pro se* prisoner complaint for sufficiency under Section 1915A(b)(1) as they utilize when resolving a motion to dismiss under Rule 12(b)(6). See Grayson v. Mayview State Hosp., 293 F.3d 103, 109-10 & n.11 (3d Cir. 2002); O'Brien v. U.S. Fed. Gov't, 763 F. App'x 157, 159 & n.5 (3d Cir. 2019) (*per curiam*) (nonprecedential); cf. Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000).

In deciding a Rule 12(b)(6) motion to dismiss, courts should not inquire "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Nami v. Fauver, 82 F.3d 63, 66 (3d Cir. 1996). The court must accept as true the factual allegations in the complaint and draw all reasonable inferences from them in the light most favorable to the plaintiff. See Phillips v. County of Allegheny, 515 F.3d 224, 229 (3d Cir. 2008). In addition to the facts alleged on the face of the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents" attached to a defendant's motion to dismiss if the plaintiff's claims are based upon these documents. Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)).

When the sufficiency of a complaint is challenged, the court must conduct a three-step inquiry. See Connelly v. Lane Const. Corp., 809 F.3d 780, 787 (3d Cir. 2016) (internal citations and quotation marks omitted) (footnote omitted). At step one, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009) (alterations in original)). Second, the court should distinguish well-pleaded factual allegations—which must be taken as true—from mere legal conclusions, which "are not entitled to the assumption of truth" and may be disregarded. Id. (quoting Iqbal, 556 U.S. at 679). Finally, the court must review the presumed-truthful allegations "and then determine whether they plausibly give rise to an entitlement to relief." Id. (quoting Iqbal, 556 U.S. at 679). Deciding plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 681.

Because Blakeney proceeds *pro se*, his pleadings are to be liberally construed and his amended complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted). This is particularly true when the *pro se* litigant, like Blakeney, is incarcerated. See Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020) (citation omitted).

## III. DISCUSSION

Liberally construed, Blakeney's amended complaint asserts Section 1983 claims of failure to protect and retaliation. He also appears to be raising a state-law tort claim of intentional infliction of emotional distress. The court will review the sufficiency of Blakeney's claims in turn.

### A. Personal Involvement

It is well established that, in Section 1983 actions, liability cannot be "predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted); see also Ashcroft v. Iqbal, 556. U.S. 662, 676 (2009) (affirming same principle in Bivens context). Rather, a Section 1983 plaintiff must plausibly plead facts that demonstrate the defendant's "personal involvement in the alleged misconduct." Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020). Personal involvement can include direct wrongful conduct by a defendant, but it can also be demonstrated through evidence of "personal direction" or "actual knowledge and acquiescence"; however, such averments must be made with particularity. Id. (quoting Rode, 845 F.2d at 1207). Furthermore, it is equally settled that involvement in the post-incident grievance process alone does not give rise to Section 1983 liability. See id. (affirming dismissal of claims against prison officials for lack of personal involvement when officials' "only involvement" was

"their review and denial of [plaintiff]'s grievance"); Lewis v. Wetzel, 153 F. Supp. 3d 678, 696-97 (M.D. Pa. 2015) (collecting cases); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (nonprecedential); Alexander v. Gennarini, 144 F. App'x 924, 925 (3d Cir. 2005) (nonprecedential) (explaining that prisoner's claims against certain defendants were "properly dismissed" because the allegations against them "merely assert their involvement in the post-incident grievance process").

Blakeney's individual capacity claims against Secretary Harry and Superintendent Kendall fail because he does not allege their personal involvement in the purported constitutional violations. Their names, in fact, appear only in the caption, defendant-identification section, and in the "Legal Claims" section of the amended complaint. No improper or illegal conduct by these Defendants is alleged beyond conclusory assertions that they failed to protect him in violation of the Eighth Amendment. Dismissal of the individual capacity Section 1983 claims against these two Defendants for failure to state a claim is therefore required.

### B. First Amendment Retaliation Claim

Although a prisoner's constitutional rights are necessarily circumscribed, an inmate still retains First Amendment protections when they are "not inconsistent" with prisoner status or with the "legitimate penological objectives of the

corrections system." Wisniewski v. Fisher, 857 F.3d 152, 156 (3d Cir. 2017) (quoting Newman v. Beard, 617 F.3d 775, 781 (3d Cir. 2010)). To state a First Amendment retaliation claim, a plaintiff must plausibly plead that (1) "he was engaged in constitutionally protected conduct," (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the plaintiff's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. Id. (quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)); Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (quoting Rauser, 241 F.3d at 333).

There are a variety of ways to establish causation for a First Amendment retaliation claim. One method is to show "unusually suggestive" timing between the protected conduct and the adverse action. See Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). When a plaintiff relies solely on circumstantial evidence of temporal proximity, the time between the protected conduct and the adverse action is often measured in days rather than weeks or months. See Conard v. Pa. State Police, 902 F.3d 178, 184 (3d Cir. 2018). However, there is no "bright line rule limiting the length of time that may pass between a plaintiff's protected speech and an actionable retaliatory act by a defendant." Id. Another approach is to demonstrate "a pattern of antagonism

coupled with timing." DeFlaminis, 480 F.3d at 267. Finally, causation can be inferred "from the evidence gleaned from the record as a whole." Watson v. Rozum, 834 F.3d 417, 424 (3d Cir. 2016) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)). Logically, a plaintiff asserting retaliation "will have to show . . . that the decision maker had knowledge of the protected activity[.]" Moore v. City of Philadelphia, 461 F.3d 331, 351 (3d Cir. 2006) (citation omitted).

Construing his amended complaint liberally, Blakeney appears to allege that Lt. Elwell retaliated against him for filing prison grievances. (See Doc. 25 ¶ 33). He claims that Lt. Elwell threatened him that if he did not "sign off on his grievances," Blakeney would "experience something" that he had "never experience[d] before." (Id.) Blakeney then goes on to allege that he was intentionally celled with a dangerous, repeat sexual offender who violently assaulted him. These allegations, while lacking detail, plausibly state a First Amendment retaliation claim by a *pro se* prisoner-plaintiff.

To the extent that Blakeney is attempting to assert retaliation claims against different Defendants (*i.e.*, C.O. Russler and C.O. Myers, see id. ¶ 104), he does not plausibly allege causation. Unlike his claim against Lt. Elwell, Blakeney does not plead any facts showing that C.O. Russler or C.O. Myers had knowledge of Blakeney's protected conduct, nor does he plead facts showing

that his filing of prison grievances motivated their adverse action. Rather, the lone, viable retaliation claim in the amended complaint targets Lt. Elwell. All other retaliation claims will be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915A(b)(1).[2]

### C. Eighth Amendment Failure to Protect Claim

"Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012) (citation omitted), abrogated on other grounds as noted by Mack v. Yost, 968 F.3d 311, 319 n.7 (3d Cir. 2020). Prison officials, therefore, have "a duty to protect prisoners from violence at the hands of other prisoners." Id. (alteration in original) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834.

To establish an Eighth Amendment failure-to-protect claim against a prison official, the inmate must show that "(1) he was incarcerated under conditions

---

[2] In his original complaint, Blakeney raised a First Amendment retaliation claim against C.O. Zimmerman, alleging that Zimmerman lodged a false misconduct report against Blakeney for filing complaints and abuse allegations. (See Doc. 1 ¶¶ 13-14). That claim is not reasserted or incorporated into the amended complaint and therefore is abandoned. See W. Run Student Housing Assoc. v. Huntington Nat'l Bank, 712 F.3d 165, 171 (3d Cir. 2013) ("The amended complaint supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." (citations and internal quotation marks omitted)).

posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to [the prisoner's] health and safety, and (3) the official's deliberate indifference caused [the prisoner] harm." Bistrian, 696 F.3d at 367. In this context, deliberate indifference is a subjective standard; that is, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Id. (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001)). Actual knowledge or awareness of a substantial risk to an inmate's safety can be proven "in the usual ways, including inference from circumstantial evidence." Id. (quoting Farmer, 511 U.S. at 842).

In his original complaint, Blakeney's failure-to-protect claims fell short because he had not alleged facts showing that any particular Defendant was deliberately indifferent to a substantial risk to Blakeney's health or safety or that any Defendant's deliberate indifference caused his harm. (See Doc. 20 at 13-14). His amended complaint cures that deficiency. Blakeney plausibly alleges that C.O. Zimmerman, C.O. Russler, C.O. Myers, and Lt. Elwell not only had knowledge that Craddock posed a substantial risk to Blakeney's health or safety, but also that they intentionally housed Blakeney and Craddock together so that the harm would in fact occur.

Blakeney's failure-to-protect allegations against numerous other Defendants, however, are insufficient. The court will briefly explain why.

First, Blakeney's only allegation against Deputy Superintendent Albert, Major Bly, D.S.C.S. McClelland, Unit Manager Miller, C.C.P.M. Mussoline, and Unit Manager Smith Dodson is that he told these Defendants that there was "tension" between Craddock and himself and that the two were not supposed to be cellmates due to Blakeney's AC status.[3] Such allegations do not establish that these Defendants "knowingly and unreasonably disregard[ed] an *objectively intolerable* risk of harm." Farmer, 511 U.S. at 846 (emphasis added).

As to Sgt. Kansas and C.O. Tidwell, Blakeney claims that on one occasion these Defendants were informed that Blakeney and Craddock had different custody statuses and should not have been celled together. Both Defendants responded that they would investigate the issue. Once again, these minimal allegations do not suffice to plausibly plead that Kansas and Tidwell knew of a substantial risk of harm to Blakeney or that they recklessly disregarded that risk. At most, Kansas and Tidwell were made aware that a particular prison policy was being violated. But such allegations, which perhaps implicate negligence, fall far short of demonstrating deliberate indifference to a substantial risk of serious harm.

[3] Blakeney also alleges that he informed Unit Manager Smith Dodson that he was being retaliated against by other unspecified correctional officers, (see id. ¶ 85), but these events post-date the assault by Craddock.

As explained above, Blakeney sues Secretary Harry and Superintendent Kendall for failing to protect him, but he does not allege their personal involvement in the constitutional misconduct. It follows, then, that he has also failed to plausibly allege that either high-level official knew of a substantial risk of harm to Blakeney or acted with deliberate indifference toward that risk.

There are three remaining Defendants whom Blakeney sues but are not included in the "Legal Claims" section of his amended complaint: Nurse Jane Doe, Nurse Alisha, and Lt. Benyo. To the extent Blakeney is attempting to sue these Defendants, his scant allegations against them do not establish the elements of a failure-to-protect claim or any other constitutional violation. For example, Blakeney claims that he spoke with Nurse Alisha after the food-contamination incident, and she promised to report it. (Doc. 25 ¶¶ 41-43). Nurse Jane Doe merely asked Blakeney questions after the assault by Craddock and told Blakeney she was going to document everything he told her. (Id. ¶ 68). Finally, as to Lt. Benyo, Blakeney alleges only that this prison official acted courteously and kindly during post-assault interviews. (See id. ¶¶ 75-78). Obviously, none of these benign allegations implicate constitutional misconduct.

In sum, Blakeney's failure-to-protect claims may proceed against C.O. Zimmerman, C.O. Russler, C.O. Myers, and Lt. Elwell. They will be dismissed as to any other Defendant under Section 1915A(b)(1) for failure to state a claim.

**D. Eighth Amendment Conditions of Confinement Claim**

"[T]he Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes[] cannot be free of discomfort." Thomas v. Tice, 948 F.3d 133, 139 (3d Cir. 2020) (second alteration in original) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Nevertheless, the state cannot subject an inmate to cruel and unusual punishment or inhumane treatment, such as deprivation of "basic human needs" like "food, clothing, shelter, medical care, and reasonable safety[.]" Helling v. McKinney, 509 U.S. 25, 32 (1993) (citation omitted).

To state an Eighth Amendment conditions-of-confinement claim, a plaintiff must plausibly plead both objective and subjective elements. See Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 226 (3d Cir. 2015). Objectively, the prisoner must demonstrate that "the prison official deprived the prisoner of the minimal civilized measure of life's necessities," often referred to as a "sufficiently serious" deprivation. Id. (citing Farmer v. Brennan, 511 U.S. 825, 843 (1994); Wilson v. Seiter, 501 U.S. 294, 297 (1991)). "The benchmark for alleging such deprivation is not that the inmate was merely uncomfortable; he or she must show they are 'incarcerated under conditions posing a substantial risk of serious harm.'" Clark v. Coupe, 55 F.4th 167, 179 (3d Cir. 2023) (quoting Farmer, 511 U.S. at 834).

Subjectively, the prisoner must show that "the prison official acted with deliberate indifference" to the prisoner's "health or safety." Chavarriaga, 806 F.3d at 226 (citing Farmer, 511 U.S. at 834). Deliberate indifference means that the defendant "acted or failed to act despite having knowledge that her actions or inaction, as the case may be, would subject the inmate to a substantial risk of serious harm." Id. at 227 (citing Farmer, 511 U.S. at 842).

Although Blakeney does not expressly say so, his amended complaint appears to attempt to raise two conditions-of-confinement claims. He first asserts that he was kept in a cell for months with the exhaust fan constantly running, which affected his sleep and caused "mental anguish." He additionally claims that he was served contaminated food on one occasion. Neither claim survives Section 1915A(b)(1) scrutiny.

As to the first conditions-of-confinement claim, even assuming that Blakeney has alleged a sufficiently serious deprivation (as he claims the exhaust fan disrupted his sleep), he has not plausibly alleged that any Defendant was involved. That is, he does not allege that any named Defendant placed him in the cell, kept the exhaust fan running, or even had knowledge of this alleged unconstitutional condition and was deliberately indifferent to it.

Blakeney also alleges that on one occasion on March 4, 2025, several Defendants contaminated his hamburger with O.C. spray. This allegation, while

certainly implicating unprofessional and repugnant conduct, does not rise to the level of a *constitutional* violation because it does not implicate a sufficiently serious deprivation of life's necessities.

Because Blakeney has not alleged one of the necessary elements for both of his conditions-of-confinement claims, it follows that he has not plausibly alleged such an Eighth Amendment claim against any Defendant. These claims will likewise be dismissed pursuant to Section 1915A(b)(1).

**E. Official Capacity Claims**

Blakeney sues all Defendants in their individual and official capacities. (See Doc. 25 ¶ 22). However, any official capacity claim seeking monetary damages from state officials is barred by Eleventh Amendment sovereign immunity. Additionally, Blakeney does not seek appropriate prospective injunctive relief.

The Eleventh Amendment to the United States Constitution prevents federal courts from entertaining lawsuits—by United States citizens or citizens of foreign states—brought against a state. U.S. CONST. amend. XI; Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267-68 (1997); Hans v. Louisiana, 134 U.S. 1, 10 (1890). This immunity from private suit extends to state agencies as well as state officials acting in their official capacity because such lawsuits are essentially civil actions "against the State itself." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). States may waive this immunity if they choose,

but Pennsylvania has explicitly not waived its immunity with respect to claims brought under Section 1983. See 42 PA. CONS. STAT. ANN. § 8521(b); Downey v. Pa. Dep't of Corr., 968 F.3d 299, 310 (3d Cir. 2020); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 254 & n.5 (3d Cir. 2010) (citing 42 PA. CONS. STAT. § 8521(b)). There are two exceptions to the Eleventh Amendment's bar to private suits against nonconsenting states: (1) "Congress may abrogate a state's immunity" and (2) "parties may sue state officers for *prospective* injunctive and declaratory relief." Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n of Pa., 141 F.3d 88, 91 (3d Cir. 1998) (emphasis added) (citing, *inter alia*, Ex parte Young, 209 U.S. 123 (1908)).

Blakeney's official capacity claims, to the extent they seek monetary damages, are barred by Eleventh Amendment sovereign immunity. His request for a declaration that his constitutional rights were violated seeks retrospective, rather than prospective, relief. Finally, although Blakeney requests prospective injunctive relief in the form of being "automatically released" from DOC custody, such relief is not appropriate in a Section 1983 lawsuit. If Blakeney seeks release from confinement, he must pursue such relief through a petition for a writ of habeas corpus. See Leamer v. Fauver, 288 F.3d 532, 540-41 (3d Cir. 2002). Therefore, all official capacity claims against Defendants will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1) and (2).

### F. State-Law Tort Claim

Blakeney does not explicitly assert a state-law tort claim in his "Legal Claims" section. Nevertheless, he repeatedly uses the phrase "intentional infliction of emotional distress" and indeed he has plausibly alleged such a claim against C.O. Russler.

The Pennsylvania Supreme Court has not yet explicitly recognized the tort of intentional infliction of emotional distress (IIED). See Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000). The United States Court of Appeals for the Third Circuit has predicted that the state's high court will ultimately adopt the Restatement (Second) of Torts' formulation. Williams v. Guzzardi, 875 F.2d 46, 50-51 (3d Cir. 1989); see also Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 558 n.13 (M.D. Pa. 2008) (citing Taylor, 754 A.2d at 652). A claim of IIED requires conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998) (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).

Blakeney plausibly alleges intentional infliction of emotional distress. His allegations that C.O. Russler forced him to attend a sham video visit and was instead shown violent and extremely disturbing video footage of rape, physical

assault, and other forms of sexual violence—after personally suffering from sexual assault just the prior month—is the type of outrageous and extreme conduct that the tort of IIED was intended to cover. Without a doubt, Blakeney's deeply unsettling allegations describe conduct that is "atrocious" and "utterly intolerable in a civilized society." Id.

### G. Leave to Amend

Generally, "plaintiffs who file complaints subject to dismissal under [the Prison Litigation Reform Act of 1995] should receive leave to amend unless amendment would be inequitable or futile." Grayson, 293 F.3d at 114. Further leave to amend will be denied, as Blakeney has failed to cure many of his pleading deficiencies even after "amendments previously allowed." See Foman v. Davis, 371 U.S. 178, 182 (1962); Jones v. Unknown D.O.C. Bus Driver & Transp. Crew, 944 F.3d 478, 483 (3d Cir. 2019) (concluding that, where inmate plaintiff "has already had two chances to tell his story," providing "further leave to amend would be futile").

Accordingly, this case will proceed on the following claims: (1) individual capacity Eighth Amendment failure to protect against C.O. Zimmerman, C.O. Russler, C.O. Myers, and Lt. Elwell; (2) individual capacity First Amendment retaliation against Lt. Elwell; and (3) intentional infliction of emotional distress

against C.O. Russler. All other claims will be dismissed pursuant to Section 1915A(b).

## IV. CONCLUSION

Based on the foregoing, the court will dismiss in part Blakeney's amended complaint pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted. An appropriate Order follows.

Date: 8/25/26

**BY THE COURT:**

**JUDGE JULIA K. MUNLEY**
**United States District Court**